IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FILED
MAR 10 2004

| | |
|---|---|
| MCI CONSTRUCTORS, INC.,<br>a Delaware corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>HAZEN AND SAWYER, P.C.,<br>a New York corporation,<br>CITY OF GREENSBORO, a<br>municipality organized under<br>the laws of the State of<br>North Carolina,<br><br>    Defendants. | 1:99CV00002<br>**(CONSOLIDATED)** |

\* \* \* \* \* \* \* \* \*

| | |
|---|---|
| MCI CONSTRUCTORS, LLC,<br>a Delaware corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY OF GREENSBORO, a<br>municipality organized under<br>the laws of the State of<br>North Carolina,<br>HAZEN AND SAWYER, P.C.,<br>a New York corporation,<br><br>    Defendants. | 1:02CV00396 |

MEMORANDUM OPINION AND ORDER

OSTEEN, District Judge

I.  BACKGROUND

This matter is presently before the court on National Union's and the City of Greensboro's motions for summary judgment on the City of Greensboro's claims against National Union. The general background of the case has been set forth in the court's Memorandum Opinions, dated March 24, 2000, October 6, 2000, January 18, 2001, September 6, 2002, and November 1, 2002. The following facts are relevant to the motions at hand.

On January 16, 1996, the City of Greensboro ("the City") entered into a contract with MCI Constructors, LLC ("MCI") for construction of the T.Z. Osborne Wastewater Treatment Plant in Greensboro, North Carolina ("the project"). Pursuant to the contract between MCI and the City, MCI was to secure a performance bond that was to remain "valid" for one year after the date the certificate of substantial completion was issued. Supplementary Conditions § 5.1.1. MCI subsequently arranged for National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union"), to provide the performance bond for the project. National Union's contract to issue the bond incorporated by reference the terms of the underlying contract between MCI and the City. The work began soon after the

2

underlying contract was signed.  After various delays, the City gave notice of termination to MCI by a letter, dated June 17, 1998.  By the terms of the letter, termination became effective seven days after this date.  Notice of MCI's termination was also sent the same day to National Union.

After MCI's termination, contractors were hired to complete the work on the project.  The City made a demand under the bond as a result of MCI's termination, and, on May 5, 2000, joined National Union to the ongoing litigation between the City and MCI.  The claims against National Union were later dismissed for lack of subject matter jurisdiction and procedural reasons.  <u>MCI Const., LLC v. Hazen and Sawyer, P.C.</u>, No. 1:99CV00002, slip op. at 10-11 (M.D.N.C. Oct. 6, 2000).  Specifically, this court held that the disputes clause in the MCI-City contract, requiring submission of all questions regarding performance of the contract to the City Manager, operated as a condition precedent to bringing suit on the contract.  (<u>Id.</u> at 10.)

On May 31, 2001, a Certificate of Substantial Completion was issued following the additional work performed by the replacement contractors.  On February 5, 2003, a hearing was held by the City Manager who, pursuant to the contractual authority of his position in resolving disputes, awarded damages in the amount of $13,377,842.73 to the City against MCI.  The City once again made a demand under the bond by a letter, dated February 11, 2003.

3

Having failed to receive the claimed amount, the City again joined National Union to this litigation on March 11, 2003. The City's claims are now the subject of National Union's and the City's motions for summary judgment.

II. STANDARD OF REVIEW

Summary judgment is appropriate where an examination of the pleadings, affidavits and other proper discovery materials before the court demonstrates that there is no genuine issue of material fact, thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986). If the moving party has met that burden, the nonmoving party must then persuade the court that a genuine issue does remain for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*"

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986) (citations omitted) (quoting Fed. R. Civ. P. 56(e)). The court must view the facts in the light most favorable to the nonmovant, drawing inferences favorable to that party if such inferences are reasonable. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). However, there must be more than just a factual dispute;

4

the fact in question must be material and the dispute must be genuine. Fed R. Civ. P. 56(c); <u>Anderson</u>, 477 U.S. at 248, 106 S. Ct. at 2510. A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248, 106 S. Ct. at 2510.

III. ANALYSIS

    A. National Union's Motion for Summary Judgment

National Union has moved, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on the following two claims asserted by the City: (1) breach of contract by National Union for failure to honor the City Manager's February 5, 2003 Damages Award totaling $13,377,842.73; and, in the alternative, (2) breach of contract by National Union resulting in a loss exceeding $16,000,000, as may be proven at trial. Resolution of these claims requires, first, an examination of both the law of contract interpretation and then the applicability of statutes of limitation to activities carried on by municipalities. Specifically, National Union asserts that the contract contains a limitations period barring the City's suit. Additionally, it contends that the suit is barred by the applicable statute of limitations.

    1. Contract Interpretation

In North Carolina, "[i]f the plain language of a contract is clear, the intention of the parties is inferred from the words of

the contract." Walton v. City of Raleigh, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996). If a contract is clear and unambiguous, the meaning of the contract is a matter of law for the court. Atlantic & E. Carolina Ry. Co. v. Southern Outdoor Adver., Inc., 129 N.C. App. 612, 617, 501 S.E.2d 87, 90 (1998). "[T]he court's only duty is to determine the legal effect of the language used and to enforce the agreement as written." Id. (quoting Computer Sales Int'l, Inc. v. Forsyth Mem'l Hosp., Inc., 112 N.C. App. 633, 634-35, 436 S.E.2d 263, 264-65 (1993)). In order to be deemed ambiguous, a contract must be "fairly and reasonably susceptible to either of the constructions asserted by the parties." Glover v. First Union Nat'l Bank of N.C., 109 N.C. App. 451, 456, 428 S.E.2d 206, 209 (1993).

At issue here is the interpretation of the contract, designated as the "30MGD Expansion and Upgrade of the T.Z. Osborne Wastewater Treatment Plant, Phase III, Contract 1." Although the contract was entered into between MCI and the City, the performance bond issued by National Union expressly incorporates the terms of that contract, including the section in dispute. Therefore, for purposes of National Union's motion for summary judgment on the City's counterclaims, National Union is bound by the language of MCI's contract with the City.

Section 5.1.1 of the Supplementary Conditions of the Contract states:

6

> Performance Bond - in an amount not less than 100% of the total amount payable to the Contractor by the terms of the Contract as security for the faithful performance of the work. Bond must be valid until one year after the date of issuance of the Certificate of Substantial Completion.

These Supplementary Conditions replaced previous wording of, "[t]hese Bonds shall remain in effect at least until one year after the date when final payment becomes due." Standard General Conditions § 5.1.

In particular, the parties dispute the import of the term "[b]ond must be valid until one year after the date of issuance of the Certificate of Substantial Completion." National Union contends that, by the terms of the contract, the bond was only valid for one year after the date of substantial completion, and the City's suit, filed on March 11, 2003, is therefore precluded. According to this interpretation, any suit against National Union would have had to commence within a year of May 31, 2001, the date the Certificate of Substantial Completion was issued.

The City advances an alternative interpretation. Rather than constituting a limitations period on filing suit, the City maintains that the phrase the "[b]ond must be valid" merely establishes the period of time during which claims may accrue. For example, damage caused by MCI two months after the date of substantial completion would provide a basis for a claim, while such damage occurring one year and two months after substantial completion would not.

7

Under this analysis, the clause serves not as a limitations period, but, as a period for making a demand on the performance bond, or simply a period during which claims may accrue and be asserted at a later date. In either case, the City contends it made a timely demand when it notified National Union of MCI's termination for cause by a letter, dated June 17, 1998.

The City further argues that the purpose of the one year period under section 5.1.1 is explained by the provision of section 13.12.1. Section 13.12.1 of the Standard General Conditions provides a period of time for the contractor to make corrections and states, in part:

> If within one year after the date of Substantial Completion or such longer period of time as may be prescribed by Laws or Regulations or by the terms of any applicable special guarantee required by the Contract Documents or by any specific provision of the Contract Documents, any Work is found to be *defective*, CONTRACTOR shall promptly, without cost to OWNER . . . (i) correct such *defective* Work, or, if it has been rejected by OWNER, remove it from the site and replace it with Work that is not *defective*, and (ii) satisfactorily correct or remove and replace any damage to other work or the work of others resulting therefrom.

The City's view is that the one-year "valid" period of the bond coincides with this one-year correction period. Accordingly, the City contends, the purpose for the one-year period of bond effectiveness was to insure that any damages caused during the correction period would be covered under the bond.

8

The Court finds the City's explanation of the meaning of section 5.1.1 by virtue of section 13.12.1 compelling.[1] Furthermore, the court notes the incongruity of an interpretation requiring the City to sue at the same time as asserting a claim. If the damage occurred on the last day of the one-year correction period, the City could not wait to see whether National Union would honor the claim, but would be forced to sue immediately. Conversely, National Union could avoid liability by failing to process a claim within the one year period. These unusual outcomes are not compelled by the mere presence of the word

---

[1] This interpretation advanced by Robert DiFiore, the Project Manager for the engineer, is taken into consideration by the court, but is not binding upon it. According to Section 9.4 of the Standard General Conditions:

> ENGINEER will issue with reasonable promptness such written clarifications or interpretations of the requirements of the Contract Documents (in the form of Drawings or otherwise) as ENGINEER may determine necessary, which shall be consistent with the intent of and reasonably inferable from Contract Documents. Such written clarifications and interpretations will be binding on OWNER and CONTRACTOR.

Standard General Conditions § 9.4.

While this section gives substantial authority to the project engineer, this authority is circumscribed by the very nature of the engineer's position. As indicated by the heading to Article 9 - "Engineer's Status During Construction" - the engineer is empowered to resolve disputes which otherwise may delay the progress of construction. Section 9.11 clarifies the limitation on the engineer's role by stating that the engineer is only the "*initial* interpreter of the requirements of the Contract Documents and judge of the acceptability of the Work thereunder." Standard General Conditions § 13.12.1 (emphasis added).

9

"valid." At most, the contract requires submission of a claim within one year of substantial completion, a requirement met by the City. Due to the court's determination that the contract clause is not ambiguous and does not constitute a limitations period, National Union's motion for summary judgment on this issue will be denied.

2. Application of the Statute of Limitations

In North Carolina the statute of limitations for actions upon contract is three years. N.C. Gen. Stat. § 1-52 (2002). The statute of limitations for a breach of contract claim begins to run on the date the promise is broken. Penley v. Penley, 314 N.C. 1, 20, 332 S.E.2d 51, 62 (1985). National Union contends that the City's action is therefore barred because the statute of limitations began to run on June 24, 1998, the date of MCI's termination. Whether the City may proceed against National Union depends, in part, upon the applicability of the statute of limitations to government entities.

North Carolina courts recognize the doctrine of "*nullum tempus occurrit regi*," or "time does not run against the king." Rowan County Bd. of Educ. v. United States Gypsum Co., 332 N.C. 1, 8, 418 S.E.2d 648, 653 (1992). This doctrine has the practical effect of permitting causes of action accrued by a municipality or the state to endure beyond the time period prescribed by the applicable statute of limitations. Although

10

the rule is simple in its operation, determining when it applies is a much more difficult matter. Not every governmental activity is protected by the rule. Following the distinctions laid out in governmental immunity cases, those functions which are "governmental" benefit from the rule, while "proprietary" functions do not.[2] Rowan County, 332 N.C. at 9, 418 S.E.2d at 654.

No clear rule provides an easy method for determining whether municipal functions are governmental or proprietary. North Carolina courts have suggested several general principles to apply in a given inquiry, but these principles have often led to distinctions in the case law that are tenuous at best.[3] In

---

[2] Although Rowan County makes clear that the governmental versus proprietary distinction is borrowed from the traditional governmental immunity analysis, that court also explained that, while application of sovereign immunity is increasingly less favored, the doctrine of nullum tempus stands on different policy grounds, and, in the words of the court, "retrenchment on the one does not require retrenchment on the other." Rowan County Bd. of Educ. v. United States Gypsum Co., 332 N.C. 1, 14, 418 S.E.2d 648, 657 (1992) ("While limiting sovereign immunity diminishes the government's escape of its misdeeds, the same concern for the rights of the public supports retention of nullum tempus, as that doctrine allows the government to pursue wrongdoers in vindication of public rights and the public purse.").

[3] See Millar v. Town of Wilson, 222 N.C. 340, 342, 23 S.E.2d 42, 44 (1942) ("The line between municipal operations that are proprietary and, therefore, a proper subject of suits in tort and those that are governmental and, therefore, immune from suits is sometimes difficult to draw."); see also Susan Lillian Holdsclaw, Note, Reviving a Double Standard in Statutes of Limitations and Repose: Rowan County Board of Education v. United States Gypsum Company, 71 N.C. L. Rev. 879, 899-900 (1993) (collecting North
(continued...)

11

Rhodes v. Asheville, the court provided a broad definition of governmental function in stating that a municipality acts in a sovereign capacity "while acting 'in behalf of the State' in promoting or protecting the health, safety, security or general welfare of its citizens." 230 N.C. 134, 137, 52 S.E.2d 371, 373 (1949) (quoting Millar v. Town of Wilson, 222 N.C. 340, 341, 23 S.E.2d 42, 44 (1942)). Proprietary functions, in contrast, consist of activities engaged in by municipalities involving "the management of property for their own benefit, or in the exercise of powers, assumed voluntarily for their own advantage . . . [even though] they may be engaged in some work that will enure to the general benefit of the municipality." Koontz v. City of Winston-Salem, 280 N.C. 513, 519-20, 186 S.E.2d 897, 902 (1972).

In this case, the City asserts that its suit against National Union qualifies as a governmental function because it is a suit to recover money relating to the construction of a publically funded municipal wastewater treatment plant. Applying the factors stated above, the construction of a wastewater treatment facility does appear to enhance the health and general welfare of its citizens, and thereby provides some basis for finding a governmental function. Although the service provided by the municipality is fee-based, this factor alone does not

---

[3](...continued)
Carolina cases showing the "considerable confusion" among courts analyzing the character of governmental actions).

remove the function from the sphere of governmental activity. James v. City of Charlotte, 183 N.C. 630, 632-33, 112 S.E. 423, 424 (1922) (holding that charging a fee for the removal of garbage does not alone create a proprietary function). Additionally, it does not appear that the city engaged in the activity for the purpose of making a profit or that the action of enlarging the existing facility was "assumed voluntarily for its own advantage." Koontz, 280 N.C. at 519-20, 186 S.E.2d at 902.

Due to the indeterminateness of these rules, courts have had more success in matching the facts of cases than applying formalized standards.[4] North Carolina courts have not indicated whether the operation of a wastewater treatment plant rises to the level of a governmental function. Other states that have examined similar questions have differed on the character of the government's actions in operating water treatment plants. See, e.g., City of Northglenn v. City of Thornton, 569 P.2d 319, 323

---

[4] For example, the court in Millar noted:

While the maintenance of public roads and highways is generally recognized as a governmental function, exception is made in respect to streets and sidewalks of a municipality.

This exception . . . is an 'illogical' exception to the general rule. . . . None the less, the exception has been recognized and uniformly applied in this jurisdiction and the maintenance of streets and sidewalks is classed as a ministerial or proprietary function.

222 N.C. at 342, 23 S.E.2d at 44.

13

(Colo. 1977) (operation of a waterworks system proprietary); Johnson v. City of Atlanta, 161 S.E.2d 399, 401 (Ga. Ct. App. 1968) (maintenance of a sewerage system governmental); Smith v. Spokane County, 948 P.2d 1301, 1313 (Wash. Ct. App. 1997) (providing sewer services proprietary). While the decisions of other states shed some light on the question, the governmental/proprietary distinction arises from the doctrine of state sovereignty, and, therefore, despite the well-reasoned decisions of other jurisdictions, it is a doctrine developed independently by each state. See 18 Eugene McQuillin, Municipal Corporations § 53.23 (3d ed. 1993).

Several North Carolina cases provide some guidance in the present case. Although not a case involving governmental immunity, the court in Fawcett v. Town of Mt. Airy held that the construction and operation of a public water system was motivated by a concern for health and safety. 134 N.C. 125, 127-128, 45 S.E. 1029, 1030 (1903). This provides some evidence of a governmental function, for, as stated in Rhodes, the State acts in its governmental capacity when it is "promoting or protecting the health, safety, security or general welfare of its citizens." 230 N.C. at 137, 52 S.E.2d at 373. Additionally, in State ex rel. State Art Museum Bldg. Comm'n v. Travelers Indemnity Co., the court held that the state was acting in a governmental capacity when it sued to recover on a performance bond issued for

14

the construction of a state art museum. 111 N.C. App. 330, 335, 432 S.E.2d 419, 422 (1993). The court noted that the "State's interest in providing cultural resources and educational opportunities renders the creation of an art museum a governmental function." Id. The State Art Museum decision is based upon a broad interpretation of governmental functions and appears to take the Rowan County court's lead in not restricting the doctrine of *nullum tempus*.

Therefore, because health and safety concerns are implicated by the enlargement of a wastewater treatment plant, and such functions are at least as necessary as the construction of a public art museum, this court finds that the City was performing a government function. As such, National Union's motion for summary judgment on this basis will be denied.

B. The City's Motion for Summary Judgment

The City has moved for summary judgment on its claims against National Union.[5] In disposing of National Union's motion, this court has already addressed many of the issues raised by the City. The remaining question involves whether the City is entitled to summary judgment against National Union based upon the City Manager's award in its favor. Stated differently, this

---

[5] These claims are described in the section discussing National Union's motion for summary judgment.

court must decide whether there is a genuine issue of material fact regarding the enforceability of the City Manager's award.

In prior decisions, this court has recognized that "[t]he law in North Carolina allows MCI to have a court review the City Manager's decision for bad faith or gross mistake." MCI Const., LLC v. Hazen and Sawyer, P.C., No. 1:99CV00002, 2002 WL 31094859, at *4 (M.D.N.C. Sept. 6, 2002); MCI Const., LLC v. Hazen and Sawyer, P.C., No. 1:99CV00002, slip op. at 11 (M.D.N.C. March 24, 2000). The court has also cited approvingly Elec-Trol, Inc. v. C. J. Kern Contractors, Inc., which states:

> It is also clear that where the parties stipulate expressly or in necessary effect, that the determination of the architect or engineer shall be final and conclusive, both parties are bound by his determination of those matters which he is authorized to determine, except in case of fraud or such gross mistake as would necessarily imply bad faith or a failure to exercise an honest judgment.

54 N.C. App. 626, 629-30, 284 S.E.2d 119, 121 (1981); see also Welborn Plumbing & Heating Co. v. Randolph County Bd. of Educ., 268 N.C. 85, 91, 150 S.E.2d 65, 69 (1966). Although Elec-Trol is factually different from this case in that the "final" determination is not submitted to an architect or engineer, but to the City Manager, the same standard applies. Therefore, having identified the standard of review, the relevant inquiry for purposes of summary judgment is whether there is evidence

giving rise to a genuine issue on the question of bad faith or mistake.[6]

Having agreed to the City Manager's authority to resolve disputes, MCI was aware of the conflict of interest inherent in the arrangement. This court has stated that "[h]aving contracted for the City Manager as 'referee' with full knowledge of the City Manager's employment status, MCI cannot be heard to complain that the City Manager is partial to the City." (Mem. Op., 9/6/2002, at 18.) Nonetheless, this knowledge does not excuse all possible improprieties of the City Manager. Some degree of partiality is expected from the City Manager, but such partiality is unacceptable when it leads to a decision borne of bad faith.

For its part, MCI has submitted numerous claims of bad faith or mistake by the City Manager. These claims range from impropriety in reviewing his own decisions to his alleged failure to decide dispositive issues presented to him during the hearing on damages. As indicated by this court's determinations in court on January 21, 2004, the City's evidence of fraud, bad faith, or gross mistake necessarily implying fraud or bad faith, is insufficient as a matter of law. National Union has not raised

---

[6] The fact of joint and several liability between MCI as the obligor and National Union as the surety is not sufficient, by itself, to require National Union's liability on the bond. Just as the City Manager's award against MCI is subject to review by the court for bad faith or mistake, so National Union's secondary liability is also subject to this court's review.

17

any additional legally sufficient evidence. As such, the court will grant summary judgment to the City by enforcing the City Manager's damage award against National Union.[7]

## IV. CONCLUSION

For the reasons set forth above,

IT IS ORDERED AND ADJUDGED that the City's Motion for Summary Judgment Against National Union [307] is GRANTED.

IT IS FURTHER ORDERED that the City recover from National Union the sum of $13,377,842.73, plus interest from February 5, 2003, the date of the damages awarded by the City Manager.

---

[7] The court also rejects National Union's contention that the City improperly hired its own replacement contractor rather than allow National Union to arrange completion of performance. While acknowledging that the duty of a surety in a performance bond is to insure performance, not merely payment, it is equally true that the beneficiary of a performance bond is the obligee of the bond, the City, and not National Union, the surety. N.C. Gen. Stat. § 44A-26 (2003) ("[The performance bond] shall be solely for the protection of the contracting body that is constructing the project."); see also Hartford Fire Ins. Co. v. Hayes & Lunsford Elec. Contractors, Inc., No. 3:93-CV-83, 1995 WL 419982, at *3 (4th Cir. July 14, 1995) (quoting an earlier version of the statute and stating, "§ 44A-26(a) seeks to protect governmental entities from financial hardship by providing that performance bonds issued under public contracts 'shall be solely for the protection of the contracting body which awarded the contract.'"). Therefore, National Union's assertion that it was deprived of the opportunity to perform by completing the project on its own is not supported by the plain language of the statutory bond requirement. In addition, the contract clearly states that the City has the right to complete the work itself. Standard General Conditions § 15.2.4 ("[I]f CONTRACTOR otherwise violates in any substantial way any provisions of the Contract Documents . . . OWNER may . . . terminate the services of CONTRACTOR . . . and finish the Work as OWNER may deem expedient.").

IT IS FURTHER ORDERED that National Union's Motion for Summary Judgment [283] is DENIED.

This the __10__ day of __March__ 2004.

_/s/ William L. Osteen_
United States District Judge