**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION**

MCI CONSTRUCTORS, LLC
Plaintiff,

v.

HAZEN AND SAWYER, P.C.
    a New York Corporation and
CITY OF GREENSBORO, NORTH
CAROLINA,
    A Municipality, organized under
    The laws of North Carolina,
          Defendants.

**CASE NOS. 1:99CV-00002;
1:02CV-00396**

### MEMORANDUM IN SUPPORT OF MCI'S MOTION TO VACATE

Pursuant to 9 U.S.C. §§ 10 and 12, and N.C.G.S. § 1-569.23,[1] MCI Constructors

LLC ("MCI"), respectfully requests that the Court vacate an allegedly "final award"

entered by the panel of arbitrators (the "Panel") in an ongoing and incomplete arbitration

(the "Arbitration") with the City of Greensboro, North Carolina (the "City").

### NATURE OF THE MATTER BEFORE THE COURT

This is a motion under 9 U.S.C. § 10, and N.C.G.S. § 1-569.23 to vacate an

arbitration award rendered on June 20, 2007.  As a preliminary matter, MCI notes that the

arbitration proceeding between MCI and the City is not yet concluded, and this

proceeding involves an order of the arbitration panel that does not dispose of all of the

issues in the arbitration case.  MCI would have preferred to bring this proceeding, if

necessary, at the conclusion of the entire arbitration case.  However, motions to vacate

---

[1] The Arbitration Agreement specifies that the Arbitration is controlled by the Federal Arbitration Act, and by North Carolina Law.  As such, the Revised Uniform Arbitration Act (N.C.G.S. § 1-569.1, et seq.) also applies.  *See Ekstrom v. Value Health, Inc.*, 68 F.3d 1391 (D.C. Cir. 1995) (FAA does not preempt state law regarding enforcement of arbitration agreements because such laws are consistent with the federal policy in favor of arbitration).

final arbitration awards must be filed within three months after award. 9 U.S.C.§ 12; *Taylor v. Nelson*, 788 F.2d 220 (4th Cir. 1986). In arbitration cases where the parties have bifurcated the matter between liability and damages, some federal courts have treated the arbitrators' decision in the liability phase of a bifurcated proceeding as a final award. *See*, *e.g.*, *Hart Surgical, Inc. v. UltraCision*, 244 F.3d 231, 236 (1st Cir. 2001) (holding that "the district court can review the partial award in this case," but "limit[ing] [its] holding to the situation in which there is a formal, agreed-to bifurcation at the arbitration stage.").[2] Because of these cases, MCI may lose its right to seek vacation of the award if it waits to challenge the liability award until the conclusion of the entire proceeding.

This Motion sets forth a number of grounds upon which the Court must vacate the "Award." However, if the Court determines that the Arbitration Agreement between the parties did not empower the Panel to issue a Partial Final Award, the remaining issues can be resolved at the conclusion of the entire arbitration proceeding.

As set forth herein, the Panel's June 20, 2007 "Award" must be vacated.

## STATEMENT OF FACTS

In January 2006, MCI, the City, and National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), MCI's performance bond surety, entered into an

---

[2] *See also Trade & Transport, Inc. v. Natural Petroleum Charterers Inc.*, 931 F.2d 191 (2nd Cir. 1991)(finding that a partial award on liability was a final award ); *The Crawford Group, Inc. v. Holekamp*, 2007 WL 844819 (E.D.Mo. 2007) (denying motion to dismiss motion to vacate partial award); *The Home Ins. Co v. RHA/Pennsylvania Nursing Homes, Inc.*, 127 F.Supp.2d 482 (S.D.N.Y. 2001)(confirming a partial arbitration award as to those sums in a dispute which the Panel found had been conceded and the Panel entered an award requiring that specific sum to be paid "without further delay"); *Zorra Transport Inc. v. Seaboard Trading & Shipping*, 2001 WL 417688 (S.D.N.Y. Apr. 24, 2001)(confirming a partial final award as to the existence of a warranty involved in an arbitration without addressing whether such a "partial final award" could be confirmed or vacated); *Hightower v. Superior Court*, 86 Cal. App. 4th 1415 (2001) (issuing a writ of mandamus, directing the Superior Court to confirm a "partial final award.").

agreement to arbitrate. **Exhibit 1** (the "Arbitration Agreement"). The Arbitration Agreement resolved all disputes between and among MCI, the City and National Union being litigated in the federal court by submitting those disputes to the Arbitration.

Thereafter, based upon the joint requests of MCI, the City, and National Union, the Court has stayed all proceedings until the *completion* of the *entire* arbitration. Docket No. 496 (Order) ("[T]his case shall be stayed *until the arbitration is complete*. MCI and the City shall promptly notify the court when an arbitration award has been rendered.") (emphasis added). In fact, the Arbitration Agreement expressly provides that, although the proceedings would be bifurcated, the Panel would enter a single award at the conclusion of the entire arbitration:

> *At the conclusion of the arbitration*, *the award* shall be confirmed and a judgment entered in the U.S. District Court for the Middle District of North Carolina.

Arbitration Agreement at 4 (emphasis added).

The other issue in this Motion involves the procedures regarding the Liability Phase of the Arbitration, whereby the parties submitted a defined record to the Panel (the Liability Record), to be explained during Opening Statements of three hours each, a Question and Answer Session, and Closing Arguments of six hours each. *Id.* at 2. To afford both parties a full and complete opportunity to present their respective case, the Arbitration Agreement provided, "Except as provided herein, or otherwise agreed, rules would be standard AAA Complex Commercial or JAMS rules." *Id.* at 1.

From the commencement of the Arbitration proceeding, however, the City insisted that the Panel refuse to allow MCI to present its case. For example, the Arbitration Agreement contained no provision at all relating to submission of briefs by the parties, but the City asserted the MCI should be prohibited from submitting one. On May 13,

2006, with the goal that the issues in the case might be narrowed and case decided expeditiously, MCI submitted to the Panel a memorandum of law discussing the governing legal issues in the case. **Exhibit 2**. Objecting "in the strongest possible terms to MCI's egregious unilateral filing of a brief," on May 15, 2006, the City instructed the Panel that "we had previously made clear that such activity was outside and prohibited by the Arbitration Agreement." **Exhibit 3**. The City demanded that the Panel refuse to read MCI's submission. *Id.* The Panel later notified the Parties it would not consider MCI's submission.

On July 11, 2006, in response to an e-mail from a member of the Panel, the City itself then suggested a procedure by which the Panel might acquaint itself with the factual and legal issues by focusing on specific parts of the defined record. **Exhibit 4**. On July 14, 2006, providing an example of issues that were discussed in those parts record but no longer in dispute, MCI reiterated its belief that "the parties and the Panel would be best served by a pre-hearing brief that will highlight the issues that are actually in dispute." **Exhibit 5**. On July 19, 2006, the City demanded that the Panel "disregard Mr. Foster's ex parte written arguments." **Exhibit 6** (7/19/06 e-mail from G. House at 9:28 a.m.).

During the Opening Statements on Liability, the City told the Panel not to look at an electronic version of MCI's Opening Statement or copies of the portions of the record cited therein. **Exhibit 7** (9/26/06 Tr. at 205-11). Later, after the Panel asked for a list of documents in the record to be reviewed, and one of the arbitrators requested that it be organized by issue, MCI submitted such a list, organized by issue. The City objected, and, on November 8, 2006, the Panel struck MCI's list of documents and ordered MCI to submit a new list without any guidance as to what issue the documents pertained. **Exhibit 8**. Then, on November 22, 2006, the City re-interpreted the scope of the record,

insisting that the Panel not look at any document that did not meet new conditions imposed by the City, conditions not contained in the Arbitration Agreement. **Exhibit 9**.

Although the Arbitration Agreement provided for a Question and Answer Session ("the format of the Termination Phase shall consist of … a session limited to responding to any questions the arbitrators may raise after reviewing the Termination Record"), on February 1, 2007, the City contended to the Panel that "the Arbitration Agreement doesn't require one." **Exhibit 10** (2/1/07 e-mail from M. Meeker at 1:18 p.m.). After the Panel stated it would convene the Q&A Session, MCI suggested that the better answers might be provided "if such questions were forwarded to the parties in advance." **Exhibit 11** (2/28/07 e-mail from D. Panzer at 12:26 p.m.). The City replied that it "object[ed] to the pre-submission of issues," resulting in the Panel not submitting any questions or topics in advance. *Id.* (3/2/07 e-mail from M. Meeker at 10:03 a.m.).

Finally, in the Closing Arguments, the City had the right to go "first and last." Arbitration Agreement at 2. The provision in the Arbitration Agreement that allowed the City to go "first and last" obviously contemplated that each side would be able to respond to the other: that the City would present its arguments; MCI would present its own arguments and respond to the City's arguments; and, finally, the City would respond to MCI's arguments.

The parties agreed to deliver Closing Arguments on May 30-31, 2007. But, when the time came for the City to deliver its six hour Closing Argument, the City announced that it believed that its ability to go "first and last" allowed it to defer all of its arguments until it went "last," and that it would be presenting its arguments on the merits after MCI's presentation. The City spoke in generalities for a few minutes and, without ever stating on what basis it was allowed to terminate MCI's services or why it should prevail

5

on liability, the City sat down, lying in wait for MCI's arguments.

MCI objected to this procedure because it violated the Arbitration Agreement, and caused significant prejudice to MCI, which was now being forced to respond to the City's arguments before hearing them:

> [MR. FOSTER:]  First I'd like to object and call for a ruling by the panel on the procedure.  It certainly violates the spirit of the arbitration agreement, if not the words.
>
> . . . .  But the idea here was that the city was going to put on its arguments, we were going to respond, and then they were going to have rebuttal. That's what the deal says.  Now they don't want to do that.

5/30/07 Hearing Tr. at 9:6-15.[3]  But the Panel decided that the City could wait to present all of its own arguments until after MCI no longer had a chance to respond:

> [MR. WHICHARD:]  The agreement appears to us to have a conflict in it, in that in one place it provides for six hours of closing arguments and in another, four.
>
> We are going to interpret that liberally and each side has the greater period of six hours.  But the agreement imposes no restrictions on what goes on and what it shall consist of, and the panel will not impose any restrictions on it, either.
>
> So I suppose we are then -- the city has done what it wishes to do in its opening, and we are back to you.

*Id.* at 17:3-14.  By making this ruling, the Panel deprived MCI of a fair hearing and an opportunity to respond to the charges being laid against it.

At the conclusion of the City's Closing Argument, MCI asked for an opportunity to respond to the City's argument:

> [MR. FOSTER:]  I think what we have seen today demonstrates why I asked yesterday either that we have an opportunity to respond -- because what you have before you now -- what you had when we started out was the prospect that Mr. Meeker was going to say something, I would have a

---

[3] Excerpts from the transcript of the May 30-31, 2007 Closing Arguments are attached hereto as **Exhibit 12**.

chance to respond to him, and then I was going to say something and Mr. Meeker would have a chance to respond to me. What we ended up with was Mr. Meeker had a chance to respond to me and I have never had any opportunity to respond to Mr. Meeker.

I believe that there are a number -- I could spend two hours responding to Mr. Meeker, but there are a number of serious misconceptions that you are left with because I have not had an opportunity to respond, either yesterday or today, to what he said. And I would ask you for that opportunity.

5/31/07 Hearing Tr. at 424:9-25. The Panel denied MCI's request:

[MR. WHICHARD:] The decision of the arbitrators is that the agreement has been complied with, the agreement provided for the city to open and close.

The fact that the city only used 10 minutes to open does not affect the fact that the agreement has been complied with. And our decision is informed somewhat by the fact that there have been several other opportunities for the two sides to present their contentions. So we are denying your request, Mr. Foster.

5/31/07 Hearing Tr. at 425:21-426:5.

This procedure was prejudicial to MCI because it prevented MCI from rebutting the representations made by the City, including representations that could not have been foreseen. For example, MCI asked the Panel to determine whether the City had terminated MCI's services because of outside pressures facing the City and not for reasons allowed by the contract. One of these pressures involved a lawsuit filed by the American Canoe Association ("ACA") against the City alleging that discharges from the Osborne plant (not in any way involving MCI) were polluting the North Buffalo Creek. The ACA suit was resolved by consent order entered on September 15, 1997, and the consent order imposed significant monetary fines against the City if the expansion on the plant (being worked on by MCI) was not completed by December 15, 1998.

Meanwhile, MCI's construction work was being delayed, and MCI notified the City that the delays resulted from a number of factors, including significant defects in the

design, and acts and omissions by the City's Engineer.  The consent order contained a
*force majeure* clause, allowing relief from the monetary penalties for delays beyond the
City's control.  Acts of the City's Engineer would not qualify as such.  As a result, the
City had an economic motive to blame MCI for the delays so that it could take advantage
of the *force majeure* clause.

Based upon evidence contained in the stipulated record submitted to the Panel,
MCI contended, *inter alia*, that the City had indeed terminated MCI's services to avoid
the penalties under the ACA consent decree.  After the Panel ruled that the City could
present arguments to which MCI would have no opportunity to respond, the City
represented to the Panel that, in fact, the City had never relied upon the termination of
MCI to establish a *force majeure* under the ACA consent decree.

> [ATTORNEY FOR CITY:]  And let's talk about the force majeure issue.  I
> -- we throughout this proceeding called the conspiracy theory, that MCI has
> contended that somehow the city was in some sort of conspiracy, and that
> the reason they were terminated was so that we could claim force majeure
> and get out from under the ACA consent order.

> That could not be farther from the reason that we would want to do that.

5/31/07 Hearing Tr. at 277:22-278:5.  And:

> [R]ather than what MCI is telling you, that they were using MCI as a
> scapegoat with ACA – he was warning the council that by terminating
> MCI, they very well could run into problems with the ACA because the
> project was going to be delayed.

*Id.* at 362:8-12.  The City further contended that the City could not have invoked the
*force majeure* provision even if it had wanted to.  *Id.* at 278:5-8 ("There was a force
majeure clause in the ACA contract but it did not list terminating a contractor as one of
the force majeure issues."); *id.* at 397:8-10 ("There's nothing in the force majeure clause
that says terminating your contractor is a force majeure.").  Most importantly, the City

concluded:

> There is **no** documentation of **any** type that **anywhere** indicates that there was **any** plan by the City and/or Haz[en] and Sawyer to terminate MCI and then blame them in going to the ACA or going to the City of Greensboro builders and saying, hey, it wasn't our fault.

*Id*. at 398:3-8 (emphasis added).

In reality, the City Attorney had expressly used MCI's termination as a means for the City to escape liability under the ACA Consent Decree and, in fact, the City did escape such liability by terminating MCI.[4]  As then-Assistant City Attorney Linda Miles[5] herself had set out, in writing in a letter to counsel for the ACA, the City had actively blamed MCI for the delays, had notified the ACA that the delays were MCI's fault, and had notified the ACA immediately when MCI was terminated:

> By letter dated April 30, 1998 to Ms. Hurst of your firm, I advised that the City had just received notice from MCI that the general contractor was behind schedule and would be approximately 9 months late in completion of the project.  In a letter dated May 21, 1998, you requested documentation of the construction delays.  On June 12, 1998, under cover letter to Messrs. Parrish and Wesevich of your firm, I provided documentation concerning the delay.

> About that time, the City, fearing the project would not be completed by MCI Constructors in any reasonable amount of time, and realizing the importance of this project to the City and the environment, took the drastic, but critical action of terminating the contractor for cause in June of 1998.  By telephone, I informed Mr. Parrish of the City's action.

Exhibit 13, Tab 2 (September 7, 1999 Letter from Linda Miles to Bruce Terris at 1).  A subsequent letter from Ms. Miles argued that the MCI-caused construction delays were indeed a *force majeure* under the Consent Decree:

---

[4] Attached hereto as **Exhibit 13** is MCI's submission to the Panel on this issue, which was not reviewed prior to rendering a decision on liability.  Attached to Exhibit 13 were a series of letters exchanged between City Attorney Linda Miles and the ACA regarding this very issue.

[5] Ms. Miles has since become the City Attorney.

9

The City believes that the force majeure provision of the consent decrees apply, and that the "begin operation" date in paragraph 5 of the decrees should now be January 22, 2001, instead of December 15, 1998.

*Id.* at 2 . In the same letter, Ms. Miles explained that the ACA had agreed to extend the City's compliance date on July 1, 1998 – just two weeks after the City terminated MCI:

On July 1, 1998, Mr. Parrish told me in a telephone call that the ACA would agree to extend the compliance date, or "begin operation" date, under paragraph 5 until the newly scheduled deadline for completion of the expansion and modification work. He stated that we would review the issue at that time. I asked him to send me a letter to that effect, but Mr. Parrish apparently departed for his new job at the U.S. Environmental Protection Agency before he had the opportunity to write the letter.

*Id.* at 1-2 .

Although the foregoing letters from Ms. Miles to the ACA were known to the City, they had not been contained in the stipulated record that had been submitted to the Panel. Having been precluded by the Panel from responding to the City's presentation, MCI demanded that the City correct the record.[6] Both orally and in writing the City acknowledged to MCI that "the City argued [to the ACA] that such circumstances [alleged poor performance by MCI] should be force majeure." *Id.* (June 5, 2007 E-mail from G. House). The City asked MCI to postpone any presentation to the Panel until the City had reviewed the issue (*id.*), and MCI did so. However, on June 13, 2007, the City notified MCI that it would not correct the record,[7] and MCI submitted the issue (and others like it) to the Panel on June 18, 2007, when it was sent via overnight FedEx.[8]

---

[6] Exhibit 13, Tab 3 (E-mails exchanged between G. House and D. Panzer on June 4 and 5, 2007).

[7] Exhibit 13, Tab 7 (June 13, 2007 Letter from G. House).

[8] Although it should have arrived on June 19, 2007, the FedEx delivery was delayed, and not delivered until June 20, 2007. **Exhibit 14**. On June 19, 2007, Exhibit 13 was sent to the Panel by e-mail, along with **Exhibit 15**, which outlined the response MCI would have made had it been allowed to make one.

10

The Panel had stated that it would rule on liability by the end of June, 2007.[9] But without ever reviewing MCI's submission,[10] the Panel ruled in favor of the City on June 20, 2007, stating that its ruling on liability was both "final" and an "Award."[11]

## QUESTIONS PRESENTED

1. Whether the June 20, 2007, "Award" must be vacated because

(a) the Panel exceeded its powers by entering what purports to be a Final Award in the Liability Phase when the Arbitration Agreement specifically provided for only a single confirmable award to be entered at the conclusion of the entire proceeding;

(b) the Panel refused to hear material evidence and prejudiced MCI's rights by repeatedly striking and refusing to consider MCI's submissions and not allowing MCI to respond to the City's Closing Arguments in the Liability Phase of the Arbitration; and

(c) the City obtained the "Award" by undue means by misrepresenting facts outside the record during Closing Arguments and acting to prevent MCI from being able to respond.

2. Whether the City materially breached the Arbitration Agreement by, *inter alia*, failing to act in accordance with the implied covenant of good faith and fair dealing?

---

[9] [MR. SHAW:] As I read the arbitration agreement, there is a supplemental, AAA rules apply and supplement the provision that you folks have.

And the way I read that would be we would be required to give you an award on this matter within 30 days from closing of the hearing.
* * * *

[MR. WHICHARD:] And 30 days from now is June 30th, so let's assume that we're going to have you an answer.

5/31/07 Hearing Tr. at 429:4-430:7.

[10] **Exhibit 16** (June 2007 Invoice from Arbitrator Whichard and June 2007 Invoice from Arbitrator Zia). Because MCI did not select Arbitrator Shaw, and does not pay for his services, MCI does not have a copy of Arbitrator Shaw's invoice for June 2007.

[11] The Panel's June 20, 2007 "Award" is attached hereto as **Exhibit 17**.

## I. THE "AWARD" MUST BE VACATED BECAUSE THE ARBITRATION AGREEMENT DOES NOT PERMIT A PARTIAL FINAL AWARD.

If the Court determines that the Panel should not have issued a Partial Final Award, it need not resolve the other issues presented by MCI's motion at this time. Once the "Award" is vacated on this basis, the parties will proceed as they had planned: at the end of the Arbitration, the Panel will issue a single award. At that point, because the Arbitration will be complete, either or both parties would be free to move to confirm or vacate the award in the this Court because the stay pending the Arbitration would have ended. Simply put, the parties never contemplated being in this situation because they agreed that they would not be, and the Panel was not free to arrogate to itself the right to enter a confirmable award in the middle of the Arbitration.

Arbitrators have only those powers granted to them by the parties in an agreement to arbitrate.[12] And arbitrators are not authorized to rule on the extent of their own powers.[13] So, when arbitrators act in a manner that exceeds the powers set forth in the governing arbitration agreement, their resulting award must be vacated. 9 U.S.C. § 10 (a)(4) (vacatur is permitted "where the arbitrators exceeded their powers"); N.C.G.S. § 1-569.23(a)(4)(vacatur is required if "[a]n arbitrator exceeded the arbitrator's powers....").

---

[12] *See Monongahela Power Co. v. Local No. 2332, Intern Broth. of Elec. Workers, AFL-CIO-CLC*, 566 F.2d 1196, 1198 (4th Cir. 1976) (an arbitrator "derives his authority from and is bound by the terms of the contract from which he draws his authority....") (citation omitted); *see also J.M. Owen Bldg. Contractors, Inc. v. Coll. Walk, Ltd.*, 101 N.C. App. 483, 488, 400 S.E.2d 468, 471 (1991) ("An award is conclusive on matters of law and fact if decided in accordance with the legal construction of the contract in which the arbitrators derive their authority.") (modifying an award in part where the arbitrators exceeded their authority) (citation omitted).

[13] *See Cargill Rice, Inc. v. Empresa Nicaraguense Dealimentos Basicos*, 25 F.3d 223, 226 (4th Cir. 1994) (stating that an arbitrator should not be given "the power to determine his own jurisdiction") (citation and quotations omitted); *International Ass'n of Machinists v. General Elec. Co.*, 865 F.2d 902, 904 (7th Cir. 1989) (Posner, J.) ("The arbitrator is not the judge of his own authority ....").

When arbitrators fail to comply with the terms of the arbitration agreement, they exceed their powers. *See*, *e.g.*, *Patten v. Signator Ins. Agency*, 441 F.3d 230, 235 (4th Cir. 2006) (vacating district court's denial of motion to vacate because arbitrator "disregarded the plain and unambiguous terms of the governing arbitration agreement").[14] In particular, where the arbitration agreement dictates the form in which an award will be rendered, the arbitrator must render such an award. *Western Employers Ins. Co. v. Jefferies & Co.*, *Inc.*, 958 F.2d 258 (9th Cir. 1992) (vacating award because arbitrators exceeded their powers by failing to render an award that specified their findings of fact).

"The interpretation of the terms of an arbitration agreement are governed by contract principles and parties may specify by contract the rules under which arbitration will be conducted." *Trafalgar House Construction, Inc., v. MSL Enterprises, Inc.*, 128 N.C.App. 252, 256, 494 S.E.2d 613, 616 (1998) (citations omitted). Arbitrators must comply with the terms of the agreement that defines their powers. *Patten*, 441 F.3d at 237 ("Although our standard of review of an arbitration award is properly a limited and deferential one, it does not require that we affirm an award that contravenes the plain and unambiguous terms of the governing arbitration agreement.").

In this case, the Arbitration Agreement expressly states that there will be **one** confirmable award at the **conclusion** of both the liability and damages phases of the

---

[14] *See also Concourse Assoc. v. Fishman*, 399 F.3d 524, 527 (2nd Cir. 2005) (arbitrator had "no authority to fashion an alternative remedy"); *Roadway Package System, Inc. v. Kayser*, 257 F.3d 287 (3rd Cir. 2001) (arbitrator exceeded his authority by determining wrongful termination based on reasons other than the contract); *Sears Roebuck & Co. v. Teamsters Local Union No. 243*, 683 F.2d 154, 155 (6th Cir. 1982) (vacating award where "arbitrator declined to rely on the 'plain language' of the agreement".); *Polk Brothers, Inc. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent)*, 973 F.2d 593 (7th Cir. 1992) (arbitrator lacked authority to award reinstatement beyond the termination dates of the agreements); *Inter-City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184, 187 (8th Cir. 1988) (vacating award, stating "the arbitrator may not disregard or modify unambiguous contract provisions.").

13

arbitration.  *See* Arbitration Agreement at 4 ("At the conclusion of the arbitration, the award shall be confirmed and a judgment entered in the U.S. District Court for the Middle District of North Carolina.") (emphasis added).

The "Award" is not permitted by the Arbitration Agreement and must be vacated.

## II.  THE "AWARD" MUST BE VACATED BECAUSE THE PANEL REFUSED TO HEAR EVIDENCE AND PREJUDICED MCI'S RIGHTS.

Every litigant, in every forum in this country, is entitled to refute the arguments and the evidence presented against him by his opponent.  While arbitrators have wide discretion to fashion procedures, the touchstone of that discretion is fairness to the parties and everyone's right to be heard.  *Pinnacle Group, Inc., v. Shrader*, 105 N.C. App. 168, 172, 412 S.E.2d 117, 121 (1992) ("even in arbitration parties are entitled to present evidence which is material to the determination of the dispute and must be given a reasonable opportunity to make their respective arguments.") (citation omitted).

Among those specific statutory bases for vacating an arbitration award is (a) refusal to hear evidence and (b) conduct prejudicing a party.  9 U.S.C. § 10(a)(3) (vacatur permitted where arbitrators were "guilty of misconduct … in refusing to hear evidence pertinent and material to controversy.");[15] N.C.G.S. § 1-569.23(a)(2)(c) and (a)(3) (vacatur required "if: … There was: … Misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding; …[or] … An arbitrator … refused to consider evidence material to the controversy, or otherwise conducted the hearing contrary to G.S. 1-569.15 so as to prejudice substantially the rights of a party….").

---

[15] Under the Revised Uniform Arbitration Act, at any arbitration hearing, "a party to the arbitration proceeding may be heard, present evidence material to the controversy, and cross-examine witnesses appearing at the hearing." N.C.G.S. § 1-569.15(d); *see also* If such an opportunity to be heard is not allowed, the award shall be vacated.  N.C.G.S. § 1-569.23(a)(3).

14

Under North Carolina law, the right to be heard includes the right to present arguments. *Wildwoods of Lake Johnson Assoc., v. L.P. Cox Co.*, 88 N.C. App. 88, 94, 362 S.E.2d 615, 619 (1987) (The state arbitration act "provides that the parties are entitled to be heard and to present evidence which is material to the determination of the dispute. In order for the parties to be meaningfully afforded such an entitlement, they must be given a reasonable opportunity to present their respective arguments."); *Pinnacle Group, supra* ("even in arbitration parties … must be given a reasonable opportunity to make their respective arguments.")

Cases applying the Federal Arbitration Act reach the same conclusions. Arbitrators "must give each of the parties to the dispute adequate opportunity to present its evidence and **arguments**." *Hoteles Condado Beach, La Concha and Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 39 (1st Cir. 1985) (emphasis added). When an arbitrator refuses to accept briefs and decides the case before hearing all of the evidence, the award must be vacated. *International Union, United Mine Workers of America v. Marrowbone Development Co.*, 232 F.3d 383, 388 (4th Cir. 2000) (affirming vacatur of award where arbitrator did not accept evidence or briefs even though agreement required him to "receive evidence").

Unquestionably, MCI was not allowed to respond to the City's Closing Argument and MCI's submissions were routinely left unread. The Panel's after-the-fact refusal even to listen to MCI's proffer was a clear refusal to hear the evidence that MCI would have presented had it been given the opportunity. Further, the Panel's suggestion that parties had been previously given opportunities to make their arguments rings hollow in light of its systematic refusal to hear MCI's arguments. The "Award" must be vacated.

## III. THE "AWARD" MUST BE VACATED BECAUSE THE CITY PROCURED IT BY UNDUE MEANS.

Wholly apart from the conduct of the Panel, the City's own misconduct warrants vacatur of any otherwise confirmable "Award" on liability. Both the state and federal arbitration acts require vacatur when an award is procured by undue means. 9 U.S.C. § 10(a)(1) (vacatur allowed "where the award was procured by corruption, fraud, or undue means"); N.C.G.S. § 1-569.23 (a)(1) (vacatur required "if: (1) The award was procured by corruption, fraud, or other undue means; ….)." "The best reading of the term 'undue means' … is that it described underhanded or conniving ways of procuring an award that are similar to corruption or fraud, but do not precisely constitute either." *Three S Delaware, Inc., v. Dataquick Information Systems, Inc.*, __ F.3d __, 2007 WL 2004454, at *7 (4th Cir. July 12, 2007) (quotation and citation omitted).

In this case, the parties had stipulated to the evidence in the case – the "Liability Record." *See* Arbitration Agreement at 2. From that evidence, MCI argued the inference that the City terminated MCI's services, not for performance reasons, but for reasons of political convenience, including avoiding penalties under the ACA Consent Decree.[16] In response, the City did not argue to the contrary from the evidence, nor did the City downplay the point. Instead, the City told the Panel that the City *did not* attempt to use MCI's termination as a basis for escaping liability under the ACA Consent Decree:

> There is *no* documentation of *any* type that *anywhere* indicates that there was *any* plan by the City and/or Haz[en] and Sawyer to terminate MCI and then blame them in going to the ACA or going to the City of Greensboro builders and saying, hey, it wasn't our fault.

---

[16] [MR. PANZER:] There was a problem with the sewer capacity. There was a problem with the ACA. The press was getting involved. The city is trying to figure out how to solve a political problem. And ultimately, on June 16th they do solve a political problem, and they call it a termination for cause. 5/30/07 Hearing Tr. at 219:8-13.

16

5/31/07 Hearing Tr. at 398:3-8 (emphasis added).  Thus, the City breached the Arbitration Agreement by discussing facts that were outside the record and simply not true.  The City **did** use MCI's termination as a basis to escape liability under the ACA Consent Decree, as discussed above, and was successful in doing so.  *See* Ex. 3, Tab 2.

Undue means is: (1) not discoverable upon the exercise of due diligence prior to the arbitration; (2) materially related to an issue in the arbitration; and (3) established by clear and convincing evidence. *Gingiss Int'l, Inc. v. Bormet*, 58 F.3d 328, 333 (7th Cir. 1995).  The showing that an issue is "materially related to an issue in the arbitration" and "does not require the movant to establish that the result of the proceedings would have been different had the fraud not occurred." *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988) (citation omitted); *Int'l Bhd. of Teamsters, Local 519 v. United Parcel Service, Inc.*, 335 F.3d 497, 503 (6th Cir. 2003) (same).  This rule recognizes that the Court may not substitute its judgment for that of the arbitrator.  The Court may only decide whether the undue means related to an issue before the arbitrator – whether the truth changes things is for the arbitrator to decide on remand.

Here, the proof of the City's undue means is self-evident:  the City's litigation position before the Panel is directly contradicted by the attached letters from the City Attorney and not found anywhere in the Liability Record.  (To the extent that the undue means is not self-evident, the Court should order an evidentiary hearing.).[17]

Thus, the "Award" was procured by the City's misconduct, and must be vacated.

---

[17] In this case, the Panel's refusal to hear MCI's response to the City made these facts not discoverable by the Panel despite MCI's due diligence.

**IV. THE CITY MATERIALLY BREACHED THE ARBITRATION AGREEMENT BY, *INTER ALIA*, NOT ACTING IN ACCORDANCE WITH THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

An agreement to arbitrate, like any other contract, imposes upon each party the obligation to comply with the implied covenant of good faith and fair dealing. *Hooters of America v. Phillips*, 173 F.3d 933, 940 (4th Cir. 1999) ("Hooters had a duty to perform its obligations in good faith.")  Further, as a party to the Arbitration Agreement, the City had an obligation not to interfere with MCI's legitimate expectations under the Arbitration Agreement. *Id.* ("Bad faith includes 'evasion of the spirit of the bargain' and an 'abuse of a power to specify terms.' Good faith 'emphasizes faithfulness to an agreed upon common purpose and consistency with the justified expectations of the other party.'") (citations omitted). The City has breached these duties by seeking the evade the spirit of the Arbitration Agreement, by seeking to dictate the procedures to be followed under the Arbitration Agreement, and repeatedly directing the Panel not to consider MCI's evidence or argument, directions with which the Panel has complied.

If the City had any such authority to dictate terms – and it does not – "the general rule in North Carolina, where a contract confers on one party a discretionary power affecting the rights of the other party, is that such a contract is not illusory *so long as* its interpretation is exercised in an objectively reasonable manner based upon good faith and fair play." *MCI Constructors, Inc. v. City of Greensboro*, 125 Fed.Appx. 471, 477 (4th Cir. 2005).  In *Hooters*, one party to the arbitration agreement dictated "rules when taken as a whole [that were] so one-sided that their only possible purpose is to undermine the neutrality of the proceeding," 173 F.3d at 940, and the court concluded that party had thereby breaching its contractual obligation to act "in good faith."  Because parties to a contract – including a contract to arbitrate – have a duty to act in good faith, they cannot

18

attempt to take unfair advantage of the other.  In *Hooters*, the Fourth Circuit explained:

> By agreeing to settle disputes in arbitration, Phillips agreed to the prompt and economical resolution of her claims.  She could legitimately expect that arbitration would not entail procedures so wholly one-sided as to present a stacked deck.  Thus we conclude that the Hooters rules also violate the contractual obligation of good faith.

*Id.* at 940.  The City's arbitration rules – found nowhere in the Arbitration Agreement, yet imposed by the Panel – have prevented MCI from presenting its arguments, and succeeded in their goal of gagging MCI, leaving the Panel to hear only the evidence that the City chose unilaterally to present.  But no set of rules can present a stacked deck:  the City's insistence that it be heard, while MCI stands mute, renders the Arbitration Agreement illusory and unenforceable and requires vacation of the Award.

<u>**CONCLUSION**</u>

The Panel had authority to issue a single, confirmable award at the end of the Arbitration; not a Partial Final Award on liability that would require the parties to come to court while the Arbitration was still ongoing.  Thus, the June 20, 2007 "Award" must be vacated, and this Court need not delve into the other bases to vacate the "Award."

If this Court finds that the Panel was permitted to issue a Partial Final Award, it should still be vacated because (1) the Panel refused to hear MCI's presentation of evidence and otherwise prejudiced MCI, and (2) the City then breached the Arbitration Agreement and obtained the "Award" by undue means by misrepresenting to the Panel facts outside the Liability Record.  This conduct cannot stand because it renders unenforceable the parties' agreement to arbitrate.

In ruling on this Motion, this "court is not free to review the merits of the dispute and cannot substitute its judgment for that of the arbitrators." *Pinnacle Group*, 105 N.C. App. at 172, 412 S.E.2d at 121.  Thus, it is not for this Court to decide whether the

19

arbitrators' decision would have been different on liability had they actually considered MCI's evidence, or had the City not been permitted to introduce false facts from outside the Record or dictate one-sided terms of the arbitration.  Because the Panel refused to hear from MCI, and heard from the City on its one-sided terms, on matters related to material issues, the "Award" must be vacated.

Respectfully submitted this 17 day of September, 2007.

/s/ Eric C. Rowe
C. Allen Foster (N.C. Bar No. 1499)
Eric C. Rowe (N.C. Bar No. 10713)
David S. Panzer
GREENBERG TRAURIG
800 Connecticut Avenue, N.W.
Washington, D.C.  20006
Telephone:  (202) 331-3100
E-mail: rowee@gtlaw.com

Charlie C.H. Lee
Moore & Lee, LLP
1750 Tysons Boulevard, Suite 1160
McLean, VA 22102-4225
(703) 506-2050
*Counsel for MCI Constructors, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | |
|---|---|
| **MCI CONSTRUCTORS, LLC**,<br>    *Plaintiff,*<br><br>v.<br><br>**HAZEN and SAWYER, P.C.**,<br>    -and-<br>**CITY OF GREENSBORO, NORTH CAROLINA**,<br>    *Defendants.* | **CASE NOS. 1:99CV-00002;**<br>**1:02CV-00396** |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY on September 17th, 2007, I electronically filed the foregoing with the clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Hazen & Sawyer, P.C.; The City of Greensboro, North Carolina; and National Union Fire Insurance Company of Pittsburgh, PA.

Respectfully submitted,

/s/ Eric C. Rowe
Eric C. Rowe
GREENBERG TRAURIG
800 Connecticut Avenue, N.W.
Washington, D.C.  20006
Telephone:  (202) 331-3100
rowee@gtlaw.com
N.C. Bar No. 10713