**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

MCI CONSTRUCTORS, LLC
Plaintiff,
v.
HAZEN AND SAWYER, P.C.
      a New York Corporation and
CITY OF GREENSBORO, NORTH
CAROLINA,
      A Municipality, organized under
      The laws of North Carolina,
           Defendants.

**CASE NOS. 1:99CV-00002;**
**1:02CV-00396**

## MEMORANDUM IN SUPPORT OF MCI'S MOTION TO VACATE DAMAGES AWARD

Pursuant to 9 U.S.C. §§ 10 and 12, MCI Constructors LLC ("MCI"), respectfully submits this memorandum in support of its motion to vacate the Arbitration Award rendered by the arbitrators dated April 17, 2008 ("the Damages Award").

## NATURE OF THE MATTER BEFORE THE COURT

This is a motion under 9 U.S.C. §§ 10 and 12 to vacate an arbitration award rendered on April 17, 2008. In the event that the Court does not grant MCI's Motion To Remand Arbitration Award, filed concurrently (Docket No. 535), the Court must vacate the Damages Award for the reasons stated herein. While some portions of this Memorandum overlap the arguments presented in favor of remand, the same cases require vacatur if remand is not ordered.

## STATEMENT OF FACTS

In January 2006, MCI, the City, and National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), MCI's performance bond surety, entered into an agreement to arbitrate. Docket No. 512, Exhibit 1 (the "Arbitration Agreement"). The Arbitration Agreement provided that the arbitrators would substitute for the City

Manager under Article 16 of the Contract between the City and MCI.  Article 16 of the

Contract provides, *inter alia*, that:

> …the City Manager [the Arbitrators] shall in all cases, determine the amount, quality and acceptability of the work and materials which are to be paid for under the contract; shall determine all questions in relation to said work and supplies, and the performance thereof; and shall in all cases decide every question which may arise relative to the fulfillment of the Contract on the part of the Contractor.

Docket No. 207, Exhibit A (Contract) at Article 16 of the Supplementary General

Conditions.   Under its Contract with the City, MCI was entitled to a decision on every

question.

The Arbitration Agreement further provided that the proceeding would be

governed by standard AAA Commercial or JAMS rules.  JAMS Rule 24(g) required the

Arbitrators to give both a breakdown of the award and an explanation of the award:

> (g)  The Award will consist of a written statement signed by the Arbitrator regarding the disposition of each claim and the relief, if any, as to each claim.  Unless all Parties agree otherwise, the Award shall also contain a concise written statement of the reasons for the Award.

Docket No. 536, MCI's Memorandum in Support of Motion to Remand, Exhibit 2.  Rule

R-43(b) of the AAA Construction Industry Rules requires a the written breakdown in all

cases, and an explanation of the award is provided only if the parties [plural] request it or

the arbitrator believes it appropriate:

> (b) The arbitrator shall provide a concise, written breakdown of the award. If requested in writing by all parties prior to the appointment of the arbitrator, or if the arbitrator believes it is appropriate to do so, the arbitrator shall provide a written explanation of the award.

*Id*.  In this case, however, even though the matter involves a construction dispute, the

Arbitration Agreement refers to the AAA "Commercial Rules."  Rule R-42 of the AAA

Commercial Rules does not address the requirement of a breakdown, but does provide

that the reasons for the award need not be given unless the parties [plural] agreed otherwise:

> R-42. Form of Award
>
> (a) Any award shall be in writing and signed by a majority of the arbitrators. It shall be executed in the manner required by law.
>
> (b) The arbitrator need not render a reasoned award unless the parties request such an award in writing prior to appointment of the arbitrator or unless the arbitrator determines that a reasoned award is appropriate.

*Id.*

The Arbitrators rendered their award on the Damages Phase of the proceeding ("the Damages Award") on April 17, 2008. Docket No. 503, Exhibit A. The Damages Award contains no express ruling on any claim or issue of either party, and provides:

> Any claims or issues of either party not expressly awarded herein, are hereby denied.

Damages Award at 2. The award nevertheless recited that MCI was obligated to pay the City the sum of $14,939,004.

## QUESTIONS PRESENTED

1. Whether the April 17, 2008, "Award" must be vacated because:

   (a) The arbitrators failed to apply the contract between the parties;

   (b) The Award violates public policy; and/or

   (c) The arbitrators were required to, and did not, provide a breakdown of the award and an explanation of it.

2. Whether there was a meeting of the minds on issues material to the Arbitration Agreement and, if so, the City materially breached the Arbitration Agreement by, *inter alia*, failing to act in accordance with the implied covenant of good faith and fair dealing?

3

## ARGUMENT

**I.     VACATION OF AN ARBITRATION AWARD IS MANDATORY WHERE THE AWARD FAILS TO DRAW ITS ESSENCE FROM THE CONTRACT.**

Arbitrators have only those powers that are provided to them under the contract between the parties.

> [A]n arbitrator … does not sit to dispense his own brand of industrial justice…. [H]is award is legitimate only so long as it draws its essence from the collective bargaining agreement.  When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).  This Court has the obligation "to insure that the arbitrator has acted within the contractually-drawn boundaries of his authority."  Champion International Corp. v. United Paperworkers International Union, AFL-CIO, 168 F.3d 725, 728 (4th Cir. 1999).  This Court must vacate an arbitrator's award if it violates clearly established public policy, fails to draw its essence from the agreement of the parties, or reflects merely the arbitrator's personal notions of right and wrong.  United States Postal Service v. American Postal Workers Union, 204 F.3d 523, 527 (4th Cir. 2000) ("USPS").

This Court does not sit in appellate review of the arbitrators' decision, but instead determines whether the arbitrators fulfilled the duties imposed on them in rendering the award.

> [I]n reviewing arbitral awards, a district court or appellate court is limited to determining whether the arbitrators did the job they were told to do -- not whether they did it well, or correctly, or reasonably, but simply whether they did it.

Remmey v. PaineWebber, Inc., 32 F.3d 143, 146 (4th Cir. 1994) (quotation marks and citations omitted).  Because the role of the court is to determine whether the arbitrators did their job, the Court must have a sufficient record before it to support a finding that

4

they did, and if the record does not support a finding that the arbitrators did their job, then the Court must vacate their award.

        **A.**      **When arbitrators have failed to apply the terms of the contract between the parties, the Court must vacate their award.**

In reviewing the award, this Court must satisfy itself that the award is grounded in the parties' contract. Enterprise Wheel, 363 U.S. at 597. Because an arbitration award must "draw its essence" from the parties' agreement, "[t]he arbitrator may not ignore the plain language of the contract." USPS, 204 F.3d at 527, *citing* United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 38 (1987).[1] In fact, the arbitrator "fails to do his job" if he "ignore[s] the plain language of the contract." USPS, 204 F.3d at 527. The arbitrator is not empowered to rewrite and change the terms of the contract between the parties, and the award of an arbitrator who does so must be vacated. Patten, 441 F.3d at 235 ("an arbitrator has acted in manifest disregard of the law if he disregards or modifies unambiguous contract provisions") (internal quotes and citation omitted).

Arbitrators are not permitted to refuse to apply the plain language of the contract, even if they conclude the result to be inappropriate. In Mountaineer Gas Co. v. Oil, Chemical & Atomic Workers International Union, 76 F.3d 606 (4th Cir. 1996) ("Mountaineer Gas"), for example, the contract reserved to the employer the right to promulgate policies, and the employer adopted a rule requiring dismissal of employees who tested positive on random drug tests. An employee tested positive and was fired. The employee challenged the termination. Citing the employee's unblemished 15-year

---

[1] While the "essence of the agreement" standard was first articulated by courts reviewing labor arbitration awards, the courts have generally acknowledged that it applies to other arbitration proceedings as well. Patten v. Signator Ins. Agency, Inc., 441 F.3d 230, 235 (4th Cir. 2006).

work history, the arbitrator ruled that termination was not justified.  The Fourth Circuit affirmed an order vacating the award, explaining "In reinstating Wilson, the arbitrator illegally created an exception to the strict application of the Drug Policy's mandatory termination.  By fashioning an entire new remedy and infusing his personal feelings and sense of fairness into the award, the arbitrator created an award that failed to draw its essence from the CBA, which clearly reserved to Mountaineer the right to promulgate and enforce such drug policies."  76 F.3d at 610.

When the record before the Court establishes that the arbitrators failed to apply the plain terms of the contract between the parties, the Court cannot make a finding that the arbitrators did their job, and the award must be vacated.

### B. The award must be vacated because the arbitrators failed to discuss critical contract terminology that might reasonably require an opposite result.

Similarly, the Fourth Circuit has ruled that when a reasonable interpretation of a contract might require a result contrary to the result reached by the arbitrator, the award must be vacated if the arbitrator has not explained how he reached his award:

> Where, as here, the arbitrator fails to discuss critical contract terminology, which terminology might reasonably require an opposite result, the award cannot be considered to draw its essence from the contract.

Clinchfield Coal Co. v. District 28, United Mine Workers of America, 720 F.2d 1365, 1369 (4th Cir. 1983) (vacating award).  In Island Creek Coal Co. v. Local Union 1254, 66 F.3d 316 (Table), 1995 WL 543524 *3 (4th Cir. 1995), the Fourth Circuit ruled that, even though a reasoned interpretation of the contract by the arbitrator would not be reviewable, the district court correctly vacated an award where the arbitrator had not rendered any interpretation of the critical contract provision at all.[2]

---

[2] In Cannelton Industries, Inc. v. District 17, United Mine Workers of America, 951 F.2d 591 (4th Cir. 1992), the arbitration award was unclear as to whether it was

In this case, the interpretations offered by MCI regarding the Articles 9 and 11 of the Contract defeated the City's damage claims in their entirety, and this Court has already ruled that MCI's interpretations were reasonable. Docket # 462, Mem Op. and Order dated 11/25/2005 ("After reviewing the arguments on this issue by both sides, the court concludes that a reasonable juror could agree with the reasoning of each party.").[3] The arbitrators awarded money to the City, a result contrary to MCI's reasonable interpretation of the Contract.

Because the Court cannot substitute its judgment for that of the arbitrator, the Court cannot presume that the arbitrators engaged in any analysis that the Court might have made, nor can the Court assume the arbitrators adopted any position advocated by the City.[4] (Indeed, the arbitrators might have based their award on something not advocated by either party.) The role of this Court is to determine whether the award draws its essence from the Contract; *i.e.*, whether the arbitrators actually interpreted the Contract at issue. Even if (and perhaps especially if), both of the parties before the Court have offered reasonable interpretations of the Contract, <u>Clinchfield Coal</u> requires the

predicated upon a permissible or impermissible basis. The court ruled that remand to the arbitrator was required:

> The union contends that Basial necessarily implied that the work at issue was of the type that would customarily be performed by union employees. However, without an explicit finding on this point, we are left with a wholly ambiguous opinion which makes impossible any reasoned determination of whether the award draws its essence from the contract.

951 F.2d at 594.

[3] MCI presented its interpretation to the arbitrators in its Opening Statement (MCI Opening Tab 2), in its Closing Argument (MCI Closing at 17-67), in its Decision Matrix (at 5-11) and also by providing the Panel a copy of MCI's original motion for summary judgment as to Change Order #6 (Docket Nos. 447-448).

[4] Indeed, the award itself recited that the arbitrators denied all claims and issues of both parties that were not expressly awarded.

arbitrators to have explained their reasoning. Otherwise, neither the parties nor the Court can determine whether the arbitrators did their job (*i.e.*, actually interpreted the contract at issue) or failed to do their job (*e.g.*, flipped a coin to decide an issue).

In circumstances where multiple claims are involved, "arbitrators must make clear the matters submitted for arbitration" because otherwise, the courts "are powerless to determine whether an arbitrator exceeded the scope of the parties' agreement." Geneva Securities, Inc. v. Johnson, 138 F.3d 688, 691 (7th Cir. 1998). In this case, for example, the City demanded that the arbitrators award them more than $89,000 paid by the City to Kemp Construction Company pursuant to Article 13 of the MCI Contract. The arbitrators were only entitled to decided claims under Articles 15.2.4, 17 and 18 of the Contract. The arbitrators were not empowered to decide claims under Article 13. The arbitrators' failure to make clear the basis of the decision renders it impossible to determine whether they rendered an award on the non-arbitrable claim. As a result, the award must be vacated. *Id.*

   C.   **The Award must be vacated because it violates clearly established public policy.**

Clearly established public policy dictates that the City, as the injured party, is entitled to just one recovery of its damages. Bowen v. Iowa National Mutual Insurance Company, 270 N.C. 486,155 S.E.2d 238, 246 (1967) ("there can be but one satisfaction of judgments arising on the same cause of action"). For this reason, the City could not recover both actual damages and liquidated damages for the same breach. Handex of the Carolinas v. County of Haywood, 168 N.C. App. 1, 607 S.E.2d 25 (2005) (trial court correctly refused to award both liquidated damages and engineering fees resulting from contractor's delay).

8

Nor can the City seek to recover expenses which are not damages at all. For example, as a political subdivision of the State of North Carolina, the City was entitled to receive from the State a refund of all sales taxes paid on materials that were incorporated into the new construction. N.C. Gen. Stat. § 105-614.14. For this reason, the City required the completion contractors and subcontractors to track and report the sales taxes paid. Because these sales taxes were refunded by the State, they were not a damage suffered by the City at all, and the City was required reduce its claim against MCI by the amount of the sales taxes that had been refunded by the State. The City nevertheless included the sales taxes in its claim, seeking a double recovery.

Because public policy prohibits compensation for damages not actually suffered, North Carolina law imposes a requirement in construction cases that the plaintiff allocate its costs. Biemann & Rowell Co. v. Donohoe Cos., 147 N.C. App. 239, 244, 556 S.E.2d 1, 5 (2001). The failure to allocate required a zero recovery to the City. RPR & Associates, Inc. v. University of North Carolina, 153 N.C. App. 342, 570 S.E.2d 510 (2002).[5]

North Carolina law further prohibits the assessment of liquidated damages that are actually a penalty, Knutton v. Cofield, 273 N.C. 355, 361, 160 S.E.2d 29, 34 (1968),[6] and

---

[5] Even if the City may have suffered some damages in fact, North Carolina law did not permit the City to recover any damages at all "unless there is proof of clear apportionment of the delay and expense applicable to each party." Biemann & Rowell Co. v. Donohoe Cos., 147 N.C. App. 239, 244, 556 S.E.2d 1, 5 (2001). The failure to allocate required a zero recovery to the City. RPR & Associates, Inc. v. University of North Carolina, 153 N.C. App. 342, 570 S.E.2d 510 (2002). The City's contract with MCI permitted the City to charge MCI only for those claims, costs, losses and damages "arising out of or resulting from completing the Work." Contract, General Conditions Article 15.2. The City was not permitted to charge MCI with other costs occurring after termination.

[6] The determination of whether the liquidated damages amount constitutes a penalty occurs on a case-by-case basis, and it is not construed as a penalty if (1) the damages that the parties might reasonably anticipate are difficult to ascertain because of their indefiniteness or uncertainty and (2) the amount stipulated was either (a) a

9

mandates that liquidated damages not be recovered at all if the delay was caused in any part by the City.  L.A. Reynolds Co. v. State Highway Commission, 271 N.C. 40, 155 S.E.2d 473, 482 (1967) ("where a contract contains a provision for liquidated damages, and delays in its completion are occasioned by mutual defaults, the courts will not attempt to apportion the damages, and the obligation for liquidated damages is annulled in the absence of a contract provision for apportionment").

For the same reasons that the Arbitrators' ruling violated clearly established North Carolina public policy, the arbitrators acted in manifest disregard of applicable North Carolina law, which required vacatur of the award.  Long John Silver Restaurants, Inc. v. Cole, 514 F.3d 345, 349-350 (4th Cir. 2008) (manifest disregard is established when (1) the applicable principle is clearly defined and not subject to reasonable debate and (2) the arbitrator refused to heed that legal principle) (citation omitted).  Likewise, the arbitrators' refusal to apply these same legal principals constitutes "other misbehavior by which the rights of any party have been prejudiced" requiring vacatur under Section 10(a)(3) of the Federal Arbitration Act.

## II.   THE AWARD MUST BE VACATED BECAUSE THE ARBITRATORS FAILED TO MAKE A MUTUAL, FINAL AND DEFINITE AWARD UPON THE SUBJECT MATTER SUBMITTED TO THEM.

Section 10(a)(4) of the Federal Arbitration Act provides that an arbitration award may be vacated:

> (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

---

reasonable estimate of damages or (b) reasonably proportionate to actual damages suffered.  Ledbetter Brothers, Inc. v. North Carolina Department of Transportation, 68 N.C. App. 97, 314 S.E.2d 761 (1984).

9 U.S.C. § 10(a)(4).  The City asserted claims to recover costs it paid to complete work under MCI's contract after it fired MCI, liquidated damages, additional engineering fees, prejudgment interest, and litigation costs.  The City presented issues to the arbitrators for decision involving its own compliance with the Contract.  In their award, the arbitrators rendered no express award on any claim or issue, ruled that all claims and issues not expressly awarded were denied, but (having denied the claims and issues of both parties) awarded nearly $15 million to the City.

In this case, the City sought to recover 28 separate categories of damages.  MCI, in turn, contended that the City was entitled to no recovery at all under the Contract because (1) the City had not fulfilled the contractual conditions precedent to recovery of money; and (2) the City had not complied with the terms of the Contract in pursuing its claims.

Article 16 of the Contract, which governed the proceedings, required the arbitrators to:

> (1) in all cases, determine the amount, quality and acceptability of the work and materials which are to be paid for under the contract;
>
> (2) determine all questions in relation to said work and supplies, and the performance thereof; and
>
> (3) in all cases decide every question which may arise relative to the fulfillment of the Contract on the part of the Contractor.

Docket No. 207, Exhibit A, General Supplementary Conditions Article 16.  This Court has previously ruled that questions of the City's compliance with its obligations under the Contract fall within this provision, as well.  Nothing in the arbitration agreement relieved the arbitrators from complying with JAMS Rule 24(g), which required, at a minimum, a breakdown of the award, and nothing in the arbitration agreement modified MCI's contractual entitlement to a decision on every question.

11

Indeed, when considering whether the arbitrators have acted in manifest disregard of the law or the evidence, "the failure of the arbitrators to explain the award can be taken into account." Halligan v. Piper Jaffray, Inc., 148 F.3d 197, 204 (2nd Cir. 1998). Here, the Panel not only refused to explain its decision in the award, but refused to offer any explanation when MCI asked for a correction. Docket No. 525, Exhibit 61.

III.  **IF THERE WAS NO MEETING OF THE MINDS ON MATERIAL ISSUES, THERE WAS NO VALID AGREEMENT TO ARBITRATE.**

Under North Carolina law, "the law of contracts governs the issue of whether there exists an agreement to arbitrate." Routh v. Snap-On Tools Corporation, 108 N.C. App. 268, 423 S.E.2d 791, 794 (1992). Before a valid contract to arbitrate can exist, there must be mutual assent between the parties as to the terms of contract. 423 S.E.2d at 795. Where there is not mutual assent, there is no contract. Id.; Goeckel v. Stokely, 236 N.C. 604, 73 S.E.2d 618, 620 (1952) ("If any portion of the proposed terms is not settled, there is no agreement.").

In this case, a serious disagreement exists between the parties on at least two material parts of the contractual relation between. See Docket No. 531 (MCI's Reply Brief in Support of Motion To Vacate Liability Award) at 8-9. First is the issue of briefing. The parties agree that there was no agreement between them on the issue of briefing. Yet, whether or not briefing was to be done became a source of considerable dispute. The second issue involves the scope of the work to be performed by the arbitrators. The City contends that the agreement prohibits the arbitrators from considering any document not specifically mentioned in MCI's arguments to the City Manager. MCI contends that the arbitrators must consider the entire record. This issue goes to the heart of the dispute between the City and MCI. It is a material term, and

12

because there is no meeting of the minds, then there never was any valid agreement to arbitrate at all.

## IV. THE CITY MATERIALLY BREACHED THE ARBITRATION AGREEMENT BY, *INTER ALIA*, FAILING TO COMPLY WITH THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

Under Section Two of the Federal Arbitration Act, an agreement to arbitrate is enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. An agreement to arbitrate, like any other contract, imposes upon each party the obligation to comply with the implied covenant of good faith and fair dealing. Hooters of America v. Phillips, 173 F.3d 933, 940 (4th Cir. 1999) ("Hooters had a duty to perform its obligations in good faith.") Further, as a party to the Arbitration Agreement, the City had an obligation not to interfere with MCI's legitimate expectations under the Arbitration Agreement. Id. ("Bad faith includes 'evasion of the spirit of the bargain' and an 'abuse of a power to specify terms.' Good faith 'emphasizes faithfulness to an agreed upon common purpose and consistency with the justified expectations of the other party.'") (citations omitted). In its initial Motion To Vacate (Docket No. 497-498), MCI set forth various breaches by the City during the liability phase of the arbitration proceeding. On notice that such behavior might result in vacatur of any award, or even rescission of the Arbitration Agreement (Docket No. 512, Exhibit 1), the City continued such to breach the implied covenant of good faith and fair dealing during the damages phase. During this phase, the City's breaches including claiming sums that it knew it was not entitled to recover and actively seeking prevent MCI from presenting its case.

### A. The City's efforts to recover claims to which it was not entitled.

Both the governing North Carolina law and the express terms of the underlying contract between MCI and the City limited the City's recovery to those costs

13

incurred by the City in completing MCI's work.  Contract ¶ 15.2.  The implied covenant of good faith and fair dealing imposed upon the City an affirmative obligation to include in its claim only those items for which a good faith argument could be made that they were properly chargeable.  The implied covenant of good faith and fair dealing further required the City to exclude from its claim those items that were not costs accruing to the City at all, such as the sales taxes paid to the completion contractors, all of which the State had reimbursed the City.

In this case, the City breached its contract, and the arbitration agreement, by seeking to conceal the fact that it had not allocated its damages as required by the law and the contract.  *See supra*, at 9 n.5.  In this case, as discussed below, the City either knew that its claim included amounts that could not properly be charged to MCI, or it knew that it had not performed the required investigation to find out.  If it knew that its claim included improper charges, then the implied covenant of good faith and fair dealing in its contract with MCI required the City to adjust its claim.  But at the same time, if the City admitted to the arbitrators that it had not done the investigation necessary to ensure that only the proper amounts were being charged, then the City would forfeit its entire claim as a matter of law.  *Id.* (failure to allocate results in zero recovery).  As a result, the City sought to prevent MCI from demonstrating that the City had not removed the improper charges from its claim.

The most egregious example involves the City's claim to recover amounts it paid to Haren Construction Company ("Haren"), which were discussed at length in Part Four of MCI's Opening Statement.  *See* Docket 523, Exhibit 45, MCI's Opening Statement Powerpoint, Part 4, ("MCI Opening, Tab 4").   In 1998, after terminating MCI's services under the Contract, the City had hired Haren on a time and materials basis to complete a

portion of MCI's work. The initial estimate for Haren's work was $3,838,000, and Haren posted a performance bond in that amount. *Id.* The City ultimately paid Haren more than $9.4 million -- a massive cost overrun. *Id.* Although the City itself had never even inquired into the reasons for Haren's excessive costs, the City contended to the arbitrators that the "incredible level of detail" in the Haren documentation proved the City's entitlement. Docket No. 522-23, Exhibit 43 ("8/07 Hearing Tr.") at 54 ("This is an incredible level of detail. And I know you're not familiar with -- Dr. Zia very well may be, but the level of detail supporting these billings is incredible.").

Despite the "incredible level of detail," the City made clear its position that the arbitrators should not spend any time looking at the Haren billings and the City objected to MCI discussing them. The City was right to be afraid of the Haren billing records and, as discussed below in section B, the City actively sought to prevent MCI from exposing the fatal flaws in the City's claim. These problems were obvious on the face of the undisputed (although voluminous) record, to anyone willing to take the time to compare the actual invoices to the relevant contract provisions. A comparison of such records to the terms of Haren's contract with the City (*see* MCI Opening, Tab 4) revealed that the City had paid Haren, and was seeking to recover from MCI, amounts that Haren had not even been permitted to charge the City under its contract, including:

- Compensation paid to officers and off-site administrative personnel. MCI Opening Tab 4 at 24-36.
- The full purchase price of new tools, including tools that were lost or stolen. MCI Opening Tab 4 at 64-73.
- Fuel and maintenance charges for equipment rented by Haren to the City. MCI Opening Tab 4 at 74-100.
- Repairs of damages to the work caused by Haren. MCI Opening Tab 4 at 115-147.

- Backcharges made to Haren subcontractors and venders. MCI Opening Tab 4 at 148-149.

- Legal fees incurred by Haren in negotiation of its contract with the City. MCI Opening Tab 4 at 169.

Haren had another contract with the City on the same site, which it had to perform for a fixed price. The billing records revealed that Haren was able to shift costs that it would have had to absorb in its fixed price contract to costs that were reimbursed (after being marked up for overhead and profit) in its time and materials contract. *See*, *e.g.*, MCI Opening Tab 4 at 57 (overtime costs for subcontractor charged to MCI contract); MCI Opening Tab 4 at 119 (cost of repairing Haren's telephone line damaged by Haren's excavation).

The billing records further revealed that the City was subsidizing Haren's overhead costs on other projects altogether -- projects that had nothing to do with the completion of MCI's work. On the purported basis that Haren's principal officers would be spending an inordinate amount of time on the MCI project, Haren negotiated an agreement from the City to pay it a "management fee" and an "extended home office support fee" on top of reimbursement of items ordinarily treated as overhead items included in the percentage markup on costs. MCI Opening Tab 4 at 192-212. Haren actually ran other projects out of its "Greensboro office," but no allocation of those costs was ever made. For example although Haren charged the City more than $16,000 for long distance telephone charges, not one telephone charge was ever allocated by Haren to a different project. Hearing Tr. 8/07 at 367-368 ("One of the things that you'll see in these billing books is, you'll see the phone bills. Haren's bills for BellSouth and AT&T for long distance charges, total of all phone bills was over 16 or $18,000 in phone bills.

16

When you look at the Haren billing books, you will not find where Haren allocated to itself or to anyone else long distance phone calls that did not relate to this project.").

No allocation was ever made of the four office trailers rented by Haren, nor the time of its administrative personnel working on those other projects. MCI Opening Tab 4 at 165; Hearing Tr. 8/07 at 380 ("Office trailers, the specs say you got to provide an office trailer. You got to provide one for the engineer. Haren bought four. They moved a very large presence to this site. They were operating and running other projects out of those job trailers. They can't charge us for the other projects that they were running.").

Haren charged the City with the cost of moving its equipment to the Greensboro site, and then the cost of moving from the Greensboro site into storage, and then the cost of moving it from storage to the next project. MCI Closing at 209-124.

The testimony presented to the arbitrators showed that the City itself had never reviewed any portion of these billings, relying upon its agent, Hazen & Sawyer to do so. MCI Opening Tab 3 at 30 *quoting* City Rule 30(b)(6) Deposition at 117:15-24 ("Q. And in your assistance in preparation of what the City is contending it is entitled to in this case, you yourself or really nobody else from the City other than the lawyers has done anything about an analysis and so on? A. No. I believe we are relying on our engineer who has been, you know, been the supervisor of the job site and who signed off on the pay estimates that they were legitimate for the conduct of the work."). For its part, Hazen & Sawyer conceded that part of its job was to determine the reasonableness of the City's claim, and that it would "unreasonable" for the City to charge MCI with items that were not chargeable under the Contract. MCI Opening Tab 6 at 12 *quoting* City Manager Damages Transcript at 542-543 ("[MR. ROWE:] Q. I mean if the claim that's being asserted by the City were to include something that was obviously not chargeable to

MCI, that amount -- it would be unreasonable to charge that to MCI by definition, wouldn't it? [MR. DIFIORE:] A. It would be, yes.") Yet Hazen & Sawyer never performed that analysis, which resulted in the thousands of improper charges.

Indeed, as described in detail in MCI Opening Tab 3, Hazen & Sawyer had not even reviewed the City's claim to recover Hazen & Sawyer's own fees, with the result that the City's claim included amounts for work never performed at all by anyone, work performed by Hazen & Sawyer on other projects, work that would have been performed by Hazen & Sawyer even in the absence of the termination of MCI, and some work for which no supporting invoices could even be found.

**B.      The City actively sought to prevent MCI from presenting its case.**

At the beginning of the Damages Hearing, MCI placed all of the binders containing the Haren billings on a table in the hearing room. 8/07 Hearing Tr. at 6-8. But before MCI had uttered even the first word of its opening statement, the City contended that it did not want to "get into" an analysis of the Haren billings. *Id.* at 7-8. While the very purpose of the opening statements was to allow the parties to give the arbitrators a guided tour of the evidence, the City demanded that the arbitrators prohibit MCI from them giving a "guided tour" of those same invoices. *Id.* at 30. At the conclusion of its own Opening Statement, the City demanded that the Panel adjourn the proceedings and begin its review of the record without even hearing MCI's Opening Statement at all. *Id.* at 148-49. Ultimately, the City moved to strike MCI's opening statement in its entirety, contending "I think you will – you will see when you finally do read the transcript that ***about 95 percent of what you heard today were – is new material***." *Id.* at 522 (emphasis added).

18

The City repeatedly argued that MCI was raising "new" issues (that the arbitrators should ignore), but never once did the City identify those issues it contended to be "new." The arbitrators permitted MCI to file a written response to the City's motion to strike, and MCI did so on September 10, 2007. Docket No. 523, Exhibit 46. With regard to each and every issue discussed by MCI in its opening statement, MCI explained in detail how the issue was not new, identifying places in the City Manager record or the City's own presentation where the issue had been raised. More than a week later, the City informed the arbitrators that it had reviewed MCI's response to the motion to strike and "will file a more detailed response." Docket No. 524, Exhibit 47.

By October 10, 2007, a full month after MCI filed its response, the City's reply had still not been received. MCI asked the arbitrators to rule on the motion. *See* Docket No. 535, MCI's Motion to Remand, Exhibit 6. Within minutes Arbitrator Whichard asked the City if it intended to file a reply. *Id.* And shortly thereafter, the City's counsel wrote to MCI, with a copy to the arbitrators, asking the arbitrators not to review MCI's response until it received the City's reply, stating:

> We do indeed intend to file a Reply to your Response, hopefully by the end of next week. In the interim, **the City respectfully requests that the panel defer review of MCI's written submission** until it receives the City's Reply so that they can be considered at the same time.

*Id.*, Exhibit 7 (emphasis added). The arbitrators then allowed the City until October 25, 2007, to file its Reply -- more than 6 weeks after MCI responded to the City's motion and nearly three months after the opening statements had occurred. On October 25, 2007, the City notified the arbitrators that it was withdrawing its motion to strike (which would moot the issue so the arbitrators would not have to read MCI's submission). To this day, the City has never identified those issues that it contended to be "new." Nor has it

explained why it was in any manner unprepared to explain why the costs it was seeking to recover from MCI were properly chargeable.

The City's material breach of the Arbitration Agreement excuses MCI and National Union from any further obligations under it.

## CONCLUSION

The Court cannot confirm the Damages Award because it cannot be determined whether the award derives its essence from the Contract, and the literal language of the award indicates that it does not. The City has materially breached the arbitration agreement, excusing MCI and National Union from having to perform further.

Respectfully submitted this 17th day of June, 2008.

 /s/ Eric C. Rowe
C. Allen Foster (N.C. Bar No. 1499)
Eric C. Rowe (N.C. Bar No. 10713)
David S. Panzer
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
Telephone: (202) 331-3100
E-mail: rowee@gtlaw.com

Charlie C.H. Lee
Moore & Lee, LLP
1750 Tysons Boulevard, Suite 1160
McLean, VA 22102-4225
(703) 506-2050
*Counsel for MCI Constructors, LLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION**

| | |
|---|---|
| **MCI CONSTRUCTORS, LLC**, <br> *Plaintiff*, <br><br> v. <br><br> **HAZEN and SAWYER, P.C.**, <br> -and- <br> **CITY OF GREENSBORO, NORTH CAROLINA**, <br> *Defendants*. | **CASE NOS. 1:99CV-00002;** <br> **1:02CV-00396** |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on June 17th, 2008, I electronically filed the foregoing with the clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Hazen & Sawyer, P.C.; The City of Greensboro, North Carolina; and National Union Fire Insurance Company of Pittsburgh, PA.

Respectfully submitted,

 /s/ Eric C. Rowe_____
Eric C. Rowe ( N.C. Bar No. 10713)
GREENBERG TRAURIG, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C.  20037
Telephone:  (202) 331-3100
rowee@gtlaw.com